UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALFRED MORIN,<br><br>                         Plaintiff,<br><br>                           v.<br><br>MARK K. LEAHY, in his official capacity as Northborough Chief of Police,<br><br>                         Defendant,<br><br>COMMONWEALTH OF MASSACHUSETTS,<br><br>                         Intervenor-Defendant. | CIVIL ACTION NO.<br>4:15-cv-40048 |

**REPLY BRIEF OF THE COMMONWEALTH OF MASSACHUSETTS
IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

In disqualifying persons like Dr. Morin with firearms-related convictions from obtaining a license to carry concealed firearms, G.L. c. 140, § 131(d)(ii)(D) comports fully with the Second Amendment. For the reasons stated in the Commonwealth's opening brief and in this reply brief, Dr. Morin's Second Amendment claim should be rejected and this Court should enter judgment in favor of the Commonwealth.

**ARGUMENT**

**I.**     <u>**The Commonwealth May Categorically Disqualify Persons Convicted of Firearms-Related Criminal Offenses from License-to-Carry Eligibility Consistent with the Second Amendment.**</u>

In moving for summary judgment, the Commonwealth explained that Section 131(d)(ii)(D) does not implicate the Second Amendment because persons with firearms-related criminal convictions are not among the "law-abiding, responsible citizens" the Amendment

1

protects. *See* Mem. of the Commonwealth in Support of Its Cross-Mot. for Summ. J., at 8–12 (Dkt. No. 25) (hereinafter "Comm. Br."). Notably, the First Circuit has held that the Legislature may prohibit categories of persons from firearms possession consistent with the Second Amendment. *See United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011). In particular, the Legislature may categorically disqualify non-violent felons, *see United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011), and may categorically disqualify certain misdemeanants, even when "the relevant misdemeanor conviction is not based on violent behavior," *see United States v. Armstrong*, 706 F.3d 1, 7–8 (1st Cir. 2013), *vacated and remanded on other grounds*, 134 S. Ct. 1759 (2014); *Booker*, 644 F.3d at 22–26. Similarly, because persons disqualified by Section 131(d)(ii)(D) have criminal convictions for misuse of weapons or ammunition, they are not among the law-abiding, responsible citizens protected by the Second Amendment, and may therefore be categorically disqualified from firearms possession. *See* Comm. Br. at 12.

In response, Dr. Morin largely contends that the cases cited by the Commonwealth for these propositions involved different facts than his case. *See See* Pltf's Mem. in Opposition to the Commonwealth's Cross-Mot. for Summ. J., at 3–6 (Dkt. No. 32) (hereinafter "Pltf's Br."). But of course they did. The Commonwealth relies on those cases not because the facts are identical, but because the cases establish principles of law that are binding on this Court and that dictate the outcome of this case.

Dr. Morin's contention that he cannot be disqualified from license-to-carry eligibility because he is not a felon is self-evidently wrong. *See* Pltf's Br. at 7–13. The Supreme Court and First Circuit have, indeed, confirmed that felons may be disqualified from firearms possession. *See District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008); *Torres-Rosario*, 658 F.3d at 113. But the First Circuit has also held, repeatedly, that persons with certain

misdemeanor convictions may also be disqualified from firearms possession consistent with the Second Amendment. *See, e.g.*, *United States v. Carter*, 752 F.3d 8, 12–13 (1st Cir. 2014); *Armstrong*, 706 F.3d at 7–8; *Booker*, 644 F.3d at 22–26.

Dr. Morin challenges the Commonwealth's reliance on the First Circuit's rulings in *United States v. Armstrong* and *United States v. Carter*, which rejected the argument that barring all domestic violence misdemeanants from firearms possession "'deprives a significant population of non-violent offenders from exercising a core constitutional right' protected by the Second Amendment." *Carter*, 752 F.3d at 12; *see also Armstrong*, 706 F.3d at 7–8 (rejecting the argument that "if the relevant misdemeanor conviction is not based on violent behavior, the statute cannot survive intermediate scrutiny as applied"). In so ruling, the First Circuit did not first characterize the defendants' conduct as violent and then uphold the disqualification on that basis. Rather, the First Circuit accepted the defendants' characterizations of their conduct as "non-violent reckless conduct" and "non-violent offensive physical contact." *See* Brief of Appellant at 35, *United States v. Carter*, No. 12–1499, 2012 WL 3644901 (1st Cir. Aug. 20, 2012); Brief of Appellant at 38, *United States v. Armstrong*, No. 12–1216, 2012 WL 2192577 (1st Cir. June 8, 2012). On that basis, the First Circuit determined that even persons convicted of domestic violence misdemeanors for purportedly non-violent conduct can be barred from firearms possession. *See Carter*, 752 F.3d at 12–13, 16; *Armstrong*, 706 F.3d at 6, 7–8.

*Carter* and *Armstrong* establish that a person may be disqualified from firearms possession when, as here, he claims that his underlying misdemeanor convictions are for non-violent conduct. *See id.* Thus, even though Dr. Morin's misdemeanor firearms convictions were based on non-violent conduct, that does not entitle him to a license to carry concealed firearms. Dr. Morin's convictions demonstrate that he is among a class of persons that, by definition, have

not handled firearms responsibly because they have violated firearms-related criminal laws. Accordingly, Dr. Morin is not among the "law-abiding, responsible citizens" entitled to Second Amendment protection, *see Heller*, 554 U.S. at 635, and his Second Amendment challenge to Section 131(d)(ii)(D) fails.

## II. Application of Section 131(d)(ii)(D) to Dr. Morin Satisfies Intermediate Scrutiny.

### A. The Commonwealth Has Submitted Empirical Evidence That Section 131(d)(ii)(D) Is Substantially Related to Promoting Public Safety and Reducing Crime.

Even if Dr. Morin's challenge to Section 131(d)(ii)(D) did implicate the Second Amendment, triggering heightened scrutiny, the statute easily survives constitutional review. Dr. Morin does not contend that this Court should review Section 131(d)(ii)(D) under strict scrutiny. The statute must, therefore, be evaluated under, at most, intermediate scrutiny. That test requires that the challenged statute be "reasonably adapted" to an important government interest. *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013). The government can justify the fit between the statute and the government interest "by reference to studies and anecdotes . . . or even . . . based solely on history, consensus, and simple common sense." *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks and citations omitted).

In demonstrating that Section 131(d)(ii)(D) is substantially related to the Commonwealth's important interests in public safety and crime prevention, the Commonwealth pointed to a compelling body of empirical research. *See* Comm. Br. at 15–16; Deft's Exs. H–K. That research showed that the class of persons regulated by Section 131(d)(ii)(D)—including persons with prior misdemeanor convictions for non-violent conduct—poses a far greater risk to public safety than the general population. *See id.* In particular, the class of persons to which Dr. Morin belongs—persons with one prior misdemeanor conviction for non-violent conduct that involved firearms—is 6.4 times more likely than persons without a prior conviction to commit

4

crimes again. *See* Deft's Ex. H (Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearms-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 J. AM. MED. ASS'N 2083, 2086, Table 5 (1998)).[1] In disqualifying those persons from carrying concealed firearms, Section 131(d)(ii)(D) aims to keep the public safe by keeping firearms away from persons six times more likely to commit crime.

Dr. Morin does not contest these studies or contend that this Court cannot consider the studies. Nor does he dispute the substantial relationship between public safety and crime prevention, on the one hand, and Section 131(d)(ii)(D)'s disqualification of persons with firearms-related misdemeanor convictions from concealed carry licensure, on the other.[2] Because that is the entire analysis under intermediate scrutiny, Dr. Morin effectively concedes his Second Amendment claim. For that reason alone, this Court should uphold Section 131(d)(ii)(D) against Dr. Morin's Second Amendment attack.[3]

---

[1] Dr. Morin actually has two prior misdemeanor convictions for non-violent, firearms-related conduct, but because the convictions arose out of the same occurrence, the class of persons described in the Wintemute study is sufficiently analogous.

[2] Dr. Morin does make the perplexing argument that, if accepted, the Commonwealth's position in this case would permit the disarmament of persons convicted of mutilating a parking ticket or failing to apply for a motor vehicle title. *See* Pltf's Br. at 15. But convictions for those misdemeanors do not disqualify anyone from obtaining a license to carry. *See* G.L. c. 140, § 131(d). And even if those convictions were a basis for disqualification, the fit between disqualifying persons convicted of those crimes, on the one hand, and public safety and crime prevention, on the other, would likely be more tenuous than in this case.

[3] Dr. Morin cites one District Court decision, *Gowder v. City of Chicago*, that sustained a Second Amendment challenge to a municipal ordinance that prohibited persons with convictions for unlawful use of a weapon from obtaining a firearms registration permit. *See* 923 F. Supp. 2d 1110 (N.D. Ill. 2012). For multiple reasons, *Gowder* is not persuasive authority. First, as the District Court itself recognized, the entire Second Amendment analysis in *Gowder* was dicta because the Court had already invalidated the ordinance as unconstitutionally vague before it reached the Second Amendment claim. *See id.* at 1116 ("Generally, once the court finds an ordinance unconstitutionally vague, the court need not consider whether the ordinance withstands Second Amendment scrutiny."). Second, in addressing the Second Amendment claim, the District Court applied strict scrutiny, but not even Dr. Morin contends that the strict scrutiny standard of review applies here. *See id.* at 1123–24. Third, when the District Court alternatively

B. <u>Dr. Morin's Personal Circumstances Are Irrelevant to His As-Applied Claim, But Even If This Court Considers Them, His Claim is Foreclosed by First Circuit Precedent.</u>

Rather than contest the fit between Section 131(d)(ii)(D) and the Commonwealth's goals of promoting public safety and preventing crime, Dr. Morin urges this Court to look only to the particular facts of his case. *See* Pltf's Br. at 10. He claims that because he asserts an as-applied challenge to Section 131(d)(ii)(D), this Court should not subject the statute to judicial scrutiny, but instead should ask whether he, personally, is a "responsible, law-abiding person entitled to exercise Second Amendment rights." *Id.* In support of this argument, Dr. Morin cites *Schrader v. Holder*, which noted that the federal felon-in-possession ban may be "vulnerable to a properly raised as-applied constitutional challenge brought by an individual who, despite a prior conviction, has become a 'law-abiding, responsible citizen[]' entitled to 'use arms in defense of hearth and home.'" 704 F.3d 980, 992 (D.C. Cir. 2013) (quoting *Heller*, 554 U.S at 635).

Dr. Morin's argument is flatly inconsistent with First Circuit precedent. Although in 2011 the First Circuit left open the possibility that personal circumstances might be relevant in an as-applied Second Amendment claim, it noted that "such an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency, and fair warning." *Torres-Rosario*, 658 F.3 at 113. One year later, in *Hightower v. City of Boston*, the First Circuit refused to consider personal circumstances in reviewing an as-applied Second Amendment challenge to G.L. c. 140, § 131(d). *See* 693 F.3d 61,

---

evaluated the ordinance under intermediate scrutiny, it noted that "the evidence presented by the City of Chicago does not properly make a distinction between misdemeanants convicted of firearm violations that involve violence and misdemeanants convicted of firearm violations that do not involve violence." *Id.* at 1125. But in this case, the Commonwealth *has* presented evidence showing that non-violent misdemeanants with weapons-related convictions are significantly more likely to recidivate. *See supra*, at 4–5; Deft's Exs. H–K. For that reason, there is a substantial relationship between Section 131(d)(ii)(D) and the Commonwealth's aims of preventing crime and promoting public safety.

71–76 (1st Cir. 2012). The plaintiff, Stacey Hightower, urged the First Circuit to consider her background in evaluating her claim that revoking her license to carry violated the Second Amendment. *See* Reply Brief of Appellant at 32, 35 *Hightower v. City of Boston*, No. 11–2281, 2012 WL 1572549 (1st Cir. May 1, 2012). The First Circuit declined to consider her personal circumstances, confining its analysis to the question whether revoking the license to carry of persons in Hightower's *class*—that is, persons who fill out firearms licensing forms inaccurately—violates the Second Amendment. *See Hightower*, 693 F.3d at 71–76. Hightower's laudable record of military and police service did not factor in the court's analysis or in its rejection of her as-applied Second Amendment claim. *See id.*

In declining to consider personal circumstances, the First Circuit's analysis in *Hightower* differs from the *Schrader* dicta cited by Dr. Morin, which suggests that personal circumstances may be relevant in an as-applied Second Amendment claim.[4] But it is the First Circuit's precedent that governs this case. And in any event, the First Circuit's approach is far more sensible. Weighing a plaintiff's personal circumstances in as-applied Second Amendment claims would undercut the rule that "the Second Amendment permits categorical regulation of gun

---

[4] The First Circuit's decision in *Hightower* also differs from the Third Circuit's dicta in *United States v. Barton*, which suggested that "[t]o raise a successful as-applied challenge, [the plaintiff] must present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." 633 F.3d 168, 174 (3d Cir. 2011). Based on *Barton*, two District Court decisions from Pennsylvania have allowed as-applied challenges to the federal felon-in-possession statute based on consideration of personal circumstances. *See Suarez v. Holder*, --- F. Supp. 3d ---, 2015 WL 685889 (M.D. Pa. Feb. 18, 2015), *appeal pending*, No. 15–1975 (CA3); *Binderup v. Holder*, 2014 WL 4764424 (E.D. Pa. Sept. 25, 2014), *appeal pending*, No. 14–4549 (CA3); Pltf's Br. at 14. But *Barton* is in tension with other Third Circuit precedent recognizing that "courts possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety." *Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) (en banc). In any event, because the *Suarez* and *Binderup* decisions are inconsistent with First Circuit precedent, they are not persuasive authority here. Furthermore, unlike Dr. Morin, the plaintiffs in those cases did not subsequently engage in conduct already determined to justify withholding a license to carry. *See infra* at 8–11.

7

possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Booker*, 644 F.3d at 23. It would open up federal courts to countless lawsuits by persons who are disqualified from firearms possession, but who nevertheless believe that their personal circumstances entitle them to possess firearms. And it would force individual federal judges, on an *ad hoc* basis, to draw lines between those persons who are sufficiently rehabilitated to possess firearms and those who are not.

Moreover, it is well established that citizens can forfeit constitutional rights by committing crimes and may not thereafter regain those rights in a lawsuit claiming that they have become law-abiding and responsible. For example, convicted felons forfeit the right to vote, *see Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), the right to serve on a jury, *see* 28 U.S.C. § 1865(b)(5), and the right to engage in various professions, *see Hawker v. New York*, 170 U.S. 189, 194 (1898), consistent with the Constitution. Dr. Morin cites no precedent holding that those rights can be restored based on changed personal circumstances after completion of a prison sentence. Nor does he offer any reason to treat the Second Amendment differently.

For all of these reasons, the question whether Dr. Morin's personal circumstances indicate that he is law-abiding and responsible is irrelevant to his Second Amendment claim. But even if this Court did look at Dr. Morin's personal circumstances, binding precedent compels the conclusion that Dr. Morin's disqualification under Section 131(d)(ii)(D) does not violate the Second Amendment. In applying to renew his license to carry in 2008, Dr. Morin falsely represented to the Northborough Police Department that he had not been convicted of any firearms-related offenses for which a term of imprisonment could be imposed. Deft's Ex. B, at 2. He made that false representation even though he signed the application under the pains and penalties of perjury. *Id.* at 3. Dr. Morin now claims that his inaccurate response was a mere

mistake, and protests that he is not a constitutional law scholar or lawyer. Pltf's Opp. at 2. But a person does not need a law degree to understand the question, "In any state or federal jurisdiction—have you ever been convicted . . . of . . . a violation of any law regulating the . . . possession . . . of weapons or ammunition for which a term of imprisonment may be imposed[?]" Deft's Ex. B, at 2. That language is straightforward and easy to comprehend, particularly for someone like Dr. Morin with a Ph.D. Indeed, tens of thousands of people apply for licenses to carry in Massachusetts each year,[5] and most are not lawyers. Dr. Morin certainly would have remembered in February 2008 that he had pleaded guilty to two violations of criminal laws regulating the possession of firearms in November 2004, as he had by that point spent at least 48 hours in prison, pleaded guilty in open court, returned to Washington for a sentencing hearing, and served his sentence and term of probation. *See* Deft's Ex. D, at 5; Deft's Ex. E.

In answering a key question falsely on his application to renew his license to carry, Dr. Morin did exactly what Stacey Hightower did in the *Hightower* case. Like Dr. Morin, Hightower "inaccurately answered a question on her license renewal form." *Hightower*, 693 F.3d at 65. Like Dr. Morin, she was not a lawyer when she completed the renewal application. And like Dr. Morin, Hightower represented that she was an upstanding citizen with a record of service. *See* Brief of Appellant at 12, *Hightower v. City of Boston*, No. 11–2281, 2012 WL 435288 (1st Cir. Feb. 7, 2012) (Hightower was a police officer for 16 years and a military veteran, was qualified to handle a variety of firearms, and was the second top shooter in her police academy class). Nevertheless, the First Circuit held that revoking her license to carry based on the inaccurate answer in her application was entirely consistent with the Second Amendment. *Hightower*, 693

---

[5] *See* M. Rocheleau, *Gun licensing continues to rise in Mass.*, Boston Globe (Jan. 27, 2016), available at https://www.bostonglobe.com/metro/2016/01/27/gun-licenses-rise-mass-percent-increase-seen/mru1o8yuwM9MiMuG1GRd6O/story.html.

F.3d at 74–75. The requirement that firearms license applicants provide truthful information, the court explained, "helps ensure the integrity of the system of keeping prohibited persons from possessing firearms." *Id.*

If it did not violate the Second Amendment to revoke Hightower's license to carry based on submission of false information, it cannot violate the Second Amendment to withhold a license to carry from Dr. Morin, when he engaged in the same conduct.[6] Indeed, Dr. Morin's personal circumstances are far less compelling than Hightower's. Not only did he submit false information on his 2008 renewal application, but he has also been twice convicted for violating criminal laws related to responsible firearms possession. And, when he drove from Massachusetts to Washington D.C. in 2004 with a loaded pistol, he violated firearms licensing laws in at least four jurisdictions other than Washington D.C. *See* Comm. Br. at 17–18. Dr. Morin claims that he "does not know how he could have learned" that his Massachusetts license to carry was not recognized in those other states, Pltf's Opp. at 2, but that only illustrates why he is not a responsible gun owner. Had he taken seriously the risks involved in transporting a loaded firearm across state lines, he could have inquired at the police station, or at the library, or simply run a Google search on the validity of his Massachusetts license in other states.[7] *Cf. United States v. Currier*, 621 F.2d 7, 9 (1st Cir. 1980) ("'ignorance of the law' is not a defense in prosecutions for violations of the federal firearms laws").

---

[6] It is irrelevant that Dr. Morin did not also submit false information on his 2015 license-to-carry application. If this Court is to consider Dr. Morin's personal circumstances in determining whether he is a law-abiding, responsible citizen, it must consider all facts bearing on that question, including Dr. Morin's prior interactions with firearms and the firearms licensing system. Dr. Morin himself urges this Court to consider facts—including his community service and employment history—that have nothing to do with his misdemeanor convictions or his 2015 license-to-carry application.

[7] Dr. Morin claims that he read the "the gun 1998 control law" when it came out, Pltf's Br. at 2, but it is not clear what law he is referring to, what jurisdiction enacted that law, or how that law has any bearing on the interstate transportation of loaded firearms.

Thus, even if this Court considers particularized facts to determine whether Dr. Morin is now a law-abiding, responsible citizen, those facts establish, under *Hightower*, that withholding a license to carry from him is consistent with the Second Amendment.

### III.     Dr. Morin Lacks Standing to Challenge G.L. c. 140, § 129B(1)(ii)(D).

Dr. Morin concedes that he lacks standing to challenge G.L. c. 140, §§ 129B(1)(i)(D) and 131(d)(i)(D) because he has no criminal convictions in Massachusetts. *See* Pltf's Br. at 16. But Dr. Morin also lacks standing to challenge G.L. c. 140, § 129B(1)(ii)(D). That statute prohibits a person who "has, in any other state or federal jurisdiction, been convicted . . . of . . . a violation of any law regulating the . . . possession . . . of weapons or ammunition for which a term of imprisonment may be imposed" from obtaining a firearm identification ("FID") card. G.L. c. 140, § 129B(1)(ii)(D). Although Section 129B(1)(ii)(D) might disqualify Dr. Morin from obtaining an FID card,[8] there is no evidence that he has ever applied for an FID card or that he ever intends to do so. But to have standing to challenge a statute, a plaintiff must allege an injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted). The plaintiff must also "demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000). Unless and until Dr. Morin submits evidence, in an affidavit or otherwise, that he applied for an FID card and was rejected in light of Section 129B(1)(ii)(D), or

---

[8] Dr. Morin may in fact be able to obtain an FID card notwithstanding his convictions. Under G.L. c. 140, § 129B(1)(ii), certain persons otherwise disqualified may be eligible for an FID card "if the applicant has been so convicted or adjudicated or released from confinement, probation or parole supervision for such conviction or adjudication, whichever occurs last, for 5 or more years immediately preceding such application and the applicant's right or ability to possess a rifle or shotgun has been fully restored in the jurisdiction wherein the conviction or adjudication was entered." Because Dr. Morin's term of probation ended more than five years ago, he may be eligible for an FID card if his right to possess a rifle or shotgun has been fully restored in Washington D.C.

that he has actual or imminent plans to apply for an FID card, he cannot establish that he has been concretely injured by Section 129B(1)(ii)(D). *See, e.g.*, *Lujan*, 504 U.S. at 564–65 (no standing to challenge regulation, even though plaintiffs submitted an affidavit testifying to their intent to engage with the subject activity, but failed to include "any description of concrete plans").

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the Commonwealth's opening brief, this Court should grant the Commonwealth's cross-motion for summary judgment, deny Dr. Morin's motion for summary judgment, and enter judgment in favor of the Commonwealth.

Respectfully submitted,

THE COMMONWEALTH OF MASSACHUSETTS,

By its attorney,

MAURA HEALEY
ATTORNEY GENERAL

 /s/ Julia Kobick
Julia Kobick, BBO #680194
Assistant Attorney General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108
Date: March 2, 2016                (617) 963-2559

**CERTIFICATE OF SERVICE**

      I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 2, 2016.

                                              /s/ Julia Kobick
                                              Julia Kobick
                                              Assistant Attorney General