## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| ALFRED MORIN, | ) | |
| | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| | ) | **NO. 4:15-CV-40048-TSH** |
| v. | ) | |
| | ) | |
| MARK K. LEAHY, in his official capacity | ) | |
| as Northborough Chief of Police, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| COMMONWEALTH | ) | |
| OF MASSACHUSETTS, | ) | |
| | ) | |
| Intervenor Defendant. | ) | |
| | ) | |

_____

### MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Docket No. 21), THE COMMONWEALTH'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket No. 24), AND MARK LEAHY'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket No. 29)

**May 18, 2016**

**HILLMAN, D.J.**

Alfred Morin (Plaintiff) brings a Second Amendment challenge to a Massachusetts statute that prevents the issuance of a Class A license to carry firearms to individuals who have been convicted in another state of certain firearms-related offenses. The Commonwealth has intervened as a Defendant, and all parties move for summary judgment. For the reasons set forth below, I find that the statute is constitutional. Plaintiff's motion for summary judgment (Docket No. 21) is ***denied***. The Commonwealth's cross-motion for summary judgment (Docket No. 24) is ***granted***. Leahy's cross-motion for summary judgment (Docket No. 29) is ***granted***.

**Background**

The following facts are undisputed.  Alfred Morin (Plaintiff) was issued a Class A license to carry firearms in 1985 by the Commonwealth of Massachusetts.  He held the license until it expired in 2008.  Morin's habit was to carry a loaded pistol on his person at all times, in a holster strapped to his ankle.  In October of 2004, he drove from Massachusetts to Washington, DC to visit his daughter, and he carried his loaded pistol with him.  He was not aware that his Massachusetts license was not recognized in the District of Columbia.  While entering a Smithsonian Museum, he noticed a sign banning firearms.  He approached a guard and asked if he could check his weapon.  The guard contacted the police, who arrested him and charged him with carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition.  Morin pled guilty to attempting to carry a pistol without a license, in violation of D.C. Code § 22-3204(a)(1), and possession of an unregistered firearm, in violation of D.C. Code § 6-2376.  He was sentenced to sixty days in prison on each count, to run concurrently, as well as three months of supervised probation and twenty hours of community service.  The prison sentence was suspended.

In February of 2008, Morin applied to renew his Class A license in Massachusetts.  The renewal application form required him to indicate whether he had, "in any state or federal jurisdiction," been convicted of a "violation of any law regulating the use, possession, ownership, sale, transfer, rental, receipt or transportation of weapons for which a term of imprisonment may be imposed." (Docket No. 28-2 at 3.)   Morin answered "no."   The Northborough Police Department ran a fingerprint check, discovered his convictions, and denied his license in accordance with Mass. Gen. Laws ch. 140, § 131(d)(ii)(D).

Seven years later, in February of 2015, Morin submitted another application for a Class A license. This time, when asked the same question about previous firearms-related convictions, he answered "yes." Because of these convictions, the Chief of Police, Mark Leahy, once again denied his application. The applicable statute prohibits the issuance of a Class A license to a "prohibited person," which includes a person who "has, in any other state or federal jurisdiction, been convicted . . . for the commission of . . . a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed." Mass. Gen. Laws ch. 140, § 131(d)(ii)(D).

On March 25, 2015, Morin brought this suit against Leahy in his official capacity as the Northborough Chief of Police, challenging the constitutionality of Mass. Gen. Laws ch. 140, §§ 129B(1)(i)(D), 129B(1)(ii)(D), and 131(d)(ii)(D).[1]  In August of 2015, the Commonwealth was allowed to intervene as a Defendant. The parties have filed cross-motions for summary judgment.

<u>**Standard of Review**</u>

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment must be denied if the evidence presented would allow a reasonable jury to return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court construes the record in the light most favorable to the

---

[1] Morin also challenged the validity of section 131(d)(i)(D), which is the equivalent of section 131(d)(ii)(D) except that it applies to firearms-related convictions within the Commonwealth. Morin concedes that he lacks standing to challenge section 131(d)(i)(D) because he was not convicted in the Commonwealth.

nonmoving party and makes all reasonable inferences in favor thereof. *Sensing v. Outback Steakhouse of Florida*, LLC, 575 F.3d 145, 153 (1st Cir. 2009).  If presented with cross-motions for summary judgment, the court "must consider each motion separately," applying the same standard to each motion. *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997).

**Discussion**

A. *Massachusetts's Firearm Licensing Scheme*

Under Massachusetts law, there are two categories of licenses to carry firearms: Class A licenses and Class B licenses. *See* Mass. Gen. Laws ch. 140, § 131(a), (b).  Both licenses must be obtained through the "licensing authority," which is defined as "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them." *Id.* § 121.

Class B licenses entitle their holders to "purchase, rent, lease, borrow, possess and carry: (i) non-large capacity firearms . . . and (ii) rifles and shotguns, including large capacity rifles and shotguns . . . ." *Id.* § 131(b).  A "Firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured." *Id.* § 121.  "Large capacity" firearms include any semi-automatic firearms "capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device." *Id.*  A "[l]arge capacity feeding device" includes any magazine or similar item that can hold "more than ten rounds." *Id.*  Class B licenses "shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place"; "shall not entitle the holder thereof to possess a large capacity firearm"; and are to be issued "subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper." *Id.* § 131(b).

Class A licenses provide the same privileges as Class B licenses, except that the holder may possess "large capacity firearms" and may carry concealed firearms in public. *Id.* § 131(a). Class A licenses are issued "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." *Id.*   Certain categories of applicants are ineligible for Class A licenses, including persons who have, "in any other state or federal jurisdiction, been convicted . . . for the commission of . . . a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed . . . ." *Id.* § 131(d)(ii)(D).  It was under this section that Morin was denied his Class A license in 2015, and which forms the basis of this lawsuit.

In addition to the two classes of licenses, a licensing authority may separately issue a firearm identification (FID) card, which is more limited than either a Class A or Class B license. An FID card permits its holder to "own, transfer, or possess a firearm in his residence or place of business." *Commonwealth v. Gouse,* 965 N.E.2d 774, 785 n.14 (Mass. 2012).  A person may apply to the licensing authority for an FID card, and various statutory requirements and exemptions govern the issuance of these cards. Mass. Gen. Laws ch. 140, § 129B(1); *see id.* § 129C.

In addition to challenging section 131(d)(ii)(D), under which Morin was denied his Class A license, Morin also challenges sections 129B(1)(i)(D) and 129B(1)(ii)(D), which govern the issuance of FID cards.  However, he has not alleged that he ever applied for or was denied an FID card.  Accordingly, because he has not been injured by the application of sections 129B(1)(i)(D) and 129B(1)(ii)(D), he lacks standing to challenge their constitutionality. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Hightower v. City of Boston*, 693 F.3d 61, 70-71

(1st Cir. 2012) (appellant whose Class A license was denied lacked standing to challenge the potential issuance of Class B license and/or FID card).

B.  *The Second Amendment and D.C. v. Heller*

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In the landmark decision of *D.C. v. Heller*, the Supreme Court held that the Second Amendment provides an individual right to bear arms. 554 U.S. 570, 576-626 (2008).  The Court based its holding on its construction of the Second Amendment's "operative clause"—"the right of the people to keep and bear Arms, shall not be infringed." *Id.* at 577, 592.  The Court interpreted this clause to "guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.  The Court held that, although "self-defense had little to do with the right's *codification;* it was the *central component* of the right itself." *Id.* at 599.  The Court explained that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

Importantly, the Court also held that "the right secured by the Second Amendment is not unlimited" and cautioned that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.  The Court further clarified that it presented "these presumptively lawful regulatory measures only as examples" rather than as an exhaustive list. *Id.* at 627 n.26.

Two years after *Heller*, the Supreme Court held that the Second Amendment applies to state and local regulation of firearms. *McDonald v. City of Chicago,* 561 U.S. 742, 750 (2010). "Together, *Heller* and *McDonald* establish that states may not impose legislation that works a complete ban on the possession of operable handguns in the home by law-abiding, responsible citizens for use in immediate self-defense." *Powell v. Tompkins*, 783 F.3d 332, 347 (1st Cir. 2015). However, the Supreme Court "did not say, and to date has not said, that *publicly* carrying a firearm unconnected to defense of hearth and home and unconnected to militia service is a definitive right of private citizens protected under the Second Amendment." *Id.* at 348.

C. *Standard of Review for Second Amendment Challenges*

Although *Heller* established that the Second Amendment guarantees an individual's right to bear arms for the purpose of self-defense, and *McDonald* made this right applicable to the states, the Supreme Court has yet to set forth a framework for analyzing constitutional challenges pursuant to the Second Amendment. *See United States v. Booker*, 644 F.3d 12, 22 (1st Cir. 2011) (citing *Heller*, 554 U.S. at 626, 634-35). In *Heller*, the plaintiff had challenged the constitutionality of a law that completely banned handgun possession in the home and also required that any lawful firearm in the home be rendered inoperable at all times. 554 U.S. at 628. The Court held that, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," the District's ban on handgun possession in the home "would fail constitutional muster." *Id.* at 628-29.

Two years after *Heller*, the Third Circuit propounded a two-step approach for Second Amendment challenges:

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. . . . If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law

> passes muster under that standard, it is constitutional. If it fails, it is
> invalid.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (citation omitted).  Regarding the

second part of the test, the Third Circuit held that the right to bear arms, like the right to free

speech, should be "susceptible to several standards of scrutiny, depending upon the type of law

challenged and the type of [arms-related conduct] at issue." *Id.* at 96-97.

Seven other circuits have since explicitly adopted the Third Circuit's approach.[2]  The First

Circuit has not; however, in conducting post-*Heller* Second Amendment challenges, the court's

analyses have not been inconsistent with the two-part framework.

D.  *First Circuit Post-Heller Second Amendment Decisions*

Since *Heller*, the First Circuit has addressed Second Amendment challenges to: 18 U.S.C.

§ 922(x)(2)(A), which bans juvenile possession of handguns; 18 U.S.C. § 922(g)(1), which

prohibits possession of firearms by persons convicted of felonies; 18 U.S.C. § 922(g)(9), which

prohibits firearm possession by individuals convicted of misdemeanor crimes of domestic

violence; and Mass. Gen. Laws ch. 140, § 131(f), which allows the licensing authority to revoke

Class A licenses on the occurrence of a disqualifying event. *See United States v. Armstrong*, 706

F.3d 1, 8 (1st Cir. 2013) (section 922(g)(9)); *Hightower*, 693 F.3d at 76-78 (section 131(f));

*Booker*, 644 F.3d at 26 (section 922(g)(9)); *United States v. Torres-Rosario*, 658 F.3d 110, 113

---

[2] *See United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518, 520 (6th Cir. 2012); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1248, 1260 n.34 (11th Cir. 2012); *Heller v. D.C.*, 670 F.3d 1244, 1252 (D.C. Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010).  The Seventh Circuit has not explicitly adopted the approach but has reached virtually the same conclusion. *See Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011).

(1st Cir. 2011) (section 922(g)(1)); *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (section 922(x)(2)(A)).  The court has upheld each one of these challenged laws.

Each of these cases, with the exception of *Hightower*, involved laws that completely ban the possession of firearms by certain classes of individuals.  In the instant case, however, like in *Hightower*, Morin challenges only his inability to receive a Class A license—which is the most comprehensive license available in Massachusetts and allows its holder to carry loaded, high-capacity, concealed firearms in public.  This distinction is significant, because although the First Circuit has not yet established a standard for reviewing Second Amendment challenges, it is apparent from the above-cited precedents that the standard differs depending on the conduct that is burdened by the law in question.  The more significantly the law burdens a person's Second Amendment rights, the more stringent the review.  In the case at hand, I find that the First Circuit's decision in *Hightower* is directly applicable, and the Second Amendment issue must be resolved in favor of the Commonwealth.

E.   *Morin's As-Applied Challenge*

Morin urges this Court to apply the two-step analytical framework that has been adopted by many of our sister Circuits, and to determine that the law burdens conduct within the scope of the Second Amendment and fails a means-ends scrutiny test.  He argues that section 131(d)(ii)(D) "implicates the core Second Amendment right to possess a handgun in [his] home for defense of hearth and home." (Docket No. 22 at 8.)  And, he asserts that the law fails under scrutiny because the Commonwealth has not met its burden of "establishing at least a strong public interest in its lifetime handgun ban on the Plaintiff" as well as "a close fit between the legislation and its broad application to its citizens to justify such a substantial encumbrance on individual rights." (Docket No. 22 at 11.)

The Commonwealth, for its part, also advocates for the two-step approach. Under this framework, the Commonwealth first argues that section 131(d)(ii)(D) does not implicate the Second Amendment, because the Second Amendment extends only to law-abiding, responsible persons. *See Heller*, 554 U.S. at 635. Morin is categorically not a law-abiding responsible person, according to the Commonwealth, because he has been convicted of weapons-related offenses.

Next, the Commonwealth argues that even if section 131(d)(ii)(D) does implicate the Second Amendment, it withstands constitutional scrutiny. Under the second prong of the two-part test, the Commonwealth asserts that section 131(d)(ii)(D) would be subject to, at most, intermediate scrutiny, because the law does not infringe on the "core" right of the Second Amendment; it regulates the carrying of concealed weapons in public rather than possession of weapons in the home. The Commonwealth further argues that section 131(d)(ii)(D) would pass muster because it is substantially related to the indisputably important governmental objective of promoting public safety and preventing crime. And, the law is narrowly tailored, because it disqualifies only those persons who are convicted of weapons- or ammunition-related offenses for which a term of imprisonment may be imposed.

The parties' arguments are well reasoned, thorough, and far more extensive than the summaries I have set forth above. However, I find that there is a more direct route to the resolution of this case—a trail forged by the First Circuit in *Hightower*, which I follow obligingly. In *Hightower*, the appellant, Stacey Hightower, had her Class A license revoked after the licensing authority learned that she had untruthfully answered a question on her license application form. 693 F.3d at 68. She challenged the law that allowed the licensing authority to revoke her license, which provides that a Class A license "may be revoked or suspended by the licensing authority if

it appears that the holder is no longer a suitable person to possess such license." Mass. Gen. Laws ch. 140, § 131(f).

The court distinguished the interest that Hightower was advancing—obtaining a license that allowed her to carry concealed weapons outside the home—from the "core interest emphasized in *Heller*," which is "the possession of operative firearms for use in defense of the home." *Hightower*, 693 F.3d at 72.  The court held that, pursuant to *Heller*, "the government may regulate the carrying of concealed weapons outside of the home." *Id.* at 73.  The court concluded that "the revocation of a firearms license on the basis of providing false information . . . is not a violation of the Second Amendment in this case." *Id.* at 74.

Here, like in *Hightower*, Morin challenges his ability to obtain a Class A license.  Although he frames the right at issue as his right to possess a firearm in the home, this argument is undermined by the fact that he seeks the least restrictive license available in Massachusetts, allowing him to carry concealed firearms in public.  Furthermore, as stated in his affidavit, it was his habit for the entire time that he maintained his Class A license—approximately twenty years— to carry a concealed pistol on his person at all times.  Thus, it is not necessary to determine whether a complete categorical prohibition on the arms rights of individuals who have been convicted of certain weapons-related misdemeanors is constitutional, because that is not what is being challenged in this case.

It is also unnecessary to speculate on the level of scrutiny that the First Circuit might apply to restrictions on the possession of firearms outside the home.  In *Hightower*, the court held that section 131(f) would pass muster under *any* level of scrutiny, because "the interest . . . in carrying concealed weapons outside the home is distinct from th[e] core interest emphasized in *Heller*." *Hightower*, 693 F.3d at 72, 74; *see also Powell*, 783 F.3d at 348 (the Supreme Court has not said

that "*publicly* carrying a firearm unconnected to defense of hearth and home and unconnected to militia service is a definitive right of private citizens protected under the Second Amendment."). Noting the highly unsettled nature of the law in this arena, the court explicitly declined to adopt a particular level of scrutiny for assessing laws that restrict a person's ability to carry concealed weapons in public. *See Hightower*, 693 F.3d at 74.  The court found it sufficient to conclude that the requirement at issue in *Hightower*—that firearms license applicants must provide truthful information—"serve[d] a variety of important purposes." *Id.* at 74.

Like section 131(f), section 131(d)(ii)(D)—the part of the Class A licensing scheme at issue in this case—also serves an important purpose; namely, preventing potentially dangerous persons from carrying concealed weapons in public.  As the Supreme Judicial Court has explained, the global purpose of section 131 is to "limit access to deadly weapons by irresponsible persons." *Chief of Police of City of Worcester v. Holden*, 26 N.E.3d 715, 723 (Mass. 2015) (citation omitted). In this regard, the Commonwealth brings my attention to empirical evidence demonstrating that persons who are convicted of weapons-related misdemeanors are significantly more likely to commit crimes in the future than are persons without such convictions.  Specifically, researchers in one study found that handgun purchasers with one prior misdemeanor conviction for non-violent conduct that involved firearms were 6.4 times more likely than persons without prior convictions to commit future criminal offenses. Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 J. AM. MED. ASS'N 2083, 2086 (1998). This same class of persons was 7.7 times more likely to commit a subsequent non-violent firearms offense and 4.4 times more likely to commit a violent offense. *Id.*

In another study, researchers found that persons with a prior misdemeanor conviction were five times more likely than persons without a conviction to commit future crimes that would disqualify them from firearms possession under state and federal law. Mona A. Wright & Garen J. Wintemute, *Felonious or Violent Criminal Activity that Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors*, 69 J. TRAUMA 948, Table 2 (2010).  Another study of nonviolent offenders released from prison showed that approximately one in five offenders were rearrested for a violent offense within three years of release. Bureau of Justice Statistics, U.S. Department of Justice, *Profile of Nonviolent Offenders Exiting State Prisons*, at 2, 4 (Oct. 2004).  Another report issued by the Department of Justice showed that 79.5% of prisoners convicted of weapons-related offenses were rearrested within five years of release. Bureau of Justice Statistics, U.S. Department of Justice, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, at 8 (Apr. 2014).

Morin seeks to counter this empirical evidence by urging the court to consider the particular facts of his situation.  He presents himself as an elderly, law-abiding citizen, who has led an exemplary life and who only accidentally committed the predicate offenses in this case.  The First Circuit has not explicitly decided whether an individual's personal circumstances are relevant in an as-applied Second Amendment challenge.  However, the court has noted that "such an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning." *Torres-Rosario*, 658 F.3d at 113.  The court has also held that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Booker*, 644 F.3d at 23 (citation omitted).  And, tellingly, in addressing as-applied Second Amendment challenges since *Heller*, the First Circuit

13

has not made individualized considerations. *See Hightower*, 693 F.3d at 76; *Armstrong*, 706 F.3d at 8; *Rene E.*, 583 F.3d at 12.

Accordingly, I decline to consider Morin's personal circumstances in deciding whether section 131(d)(ii)(D) is unconstitutional as applied to him. It would be unreasonable to expect the courts to make individualized considerations for every person who is statutorily precluded from obtaining a firearms license but who nevertheless believes that he or she should be entitled to carry a weapon. What is relevant in this as-applied challenge is the class of persons affected, not the particular circumstances of each individual's situation.

Thus, pursuant to the First Circuit's decision in *Hightower*, I find that the right to obtain a Class A license to carry a concealed firearm in public is not a "core" Second Amendment right, and that section 131(d)(ii)(D) serves the important purpose of preventing potentially dangerous individuals from carrying concealed firearms. Accordingly, the law is constitutional as applied to Morin.

### F. *Morin's Facial Challenge*

"[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)). Morin's facial challenge cannot be maintained, because his own situation presents a set of circumstances in which the application of section 131(d)(ii)(D) is constitutional.

### G. *Leahy's Additional Arguments*

Leahy joins the Commonwealth's arguments but has also filed a separate memorandum, in which he challenges whether he is a proper defendant in this suit. Leahy is named as a defendant

in his official capacity as the Chief of Police.  He argues that the claims against him should be treated as claims against the Town, and that such claims fail as a matter of law because Morin has not established that his injury was caused by a municipal policy or custom, so as to state a viable *Monell* claim.  Leahy's argument is misplaced, because Morin does not seek damages.  He seeks declaratory and prospective injunctive relief only, to enjoin an alleged ongoing constitutional violation.  This type of suit may be brought against an official who is charged with implementing the purportedly unconstitutional law. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908).  Leahy is a proper defendant in this case.

## Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment (Docket No. 21) is ***denied***, the Commonwealth's cross-motion for summary judgment (Docket No. 24) is ***granted***, and Leahy's cross-motion for summary judgment (Docket No. 29) is ***granted***.  Judgment shall enter in favor of Leahy and the Commonwealth.

**SO ORDERED.**

> */s/ Timothy S. Hillman*
> **TIMOTHY S. HILLMAN**
> **DISTRICT JUDGE**