1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    Alfred Morin,              )
                  Plaintiff,    )
5                               )
                                )
6    vs.                        )   Case No. 15cv40048-TSH
                                )
7                               )
     Mark K. Leahy,             )
8                 Defendant.    )

9

10   BEFORE:  The Honorable Timothy S. Hillman

11

12                         Motion Hearing

13

14

15                             United States District Court
                               Courtroom No. 2
16                             595 Main Street
                               Worcester, Massachusetts
17                             April 15, 2016

18

19

20

21

22
                       Marianne Kusa-Ryll, RDR, CRR
23                        Official Court Reporter
                       United States District Court
24                      595 Main Street, Room 514A
                         Worcester, MA 01608-2093
25                    508-929-3399 justicehill@aol.com
                   Mechanical Steno - Transcript by Computer

```
 1    APPEARANCES:

 2    Law Office of J. Steven Foley
      J. Steven Foley, Esquire
 3    100 Pleasant Street #100
      Worcester, Massachusetts 01609
 4    on behalf of the Plaintiff

 5    KP Law, P.C.
      Janelle M. Austin, Esquire
 6    101 Arch Street
      12th Floor
 7    Boston, Massachusetts 02110
      on behalf of the Defendant, Mark K. Leahy
 8
      Office of the Attorney General
 9    Julia E. Kobick, Assistant Attorney General
      One Ashburton Place
10    Boston Massachusetts 02108
      On behalf of the Intervenor Defendant, Commonwealth of
11    Massachusetts

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Timothy S. Hillman, United States District Judge, United States District Court, District of Massachusetts, at the Donohue Federal Building & United States Courthouse, 595 Main Street, Worcester, Massachusetts, on April 15, 2016.)

THE CLERK:  Case No. 15-40048, Morin versus Leahy.

Counsel, please note your appearance for the record.

MR. FOLEY:  Good afternoon, your Honor.  Steven Foley representing Alfred Morin.

THE COURT:  Good afternoon, Mr. Foley.

MR. FOLEY:  Good afternoon.

MS. KOBICK:  Good afternoon, your Honor.  Assistant Attorney General Julie Kobick for the Commonwealth.

THE COURT:  Good afternoon, Ms. Kobick.

MS. AUSTIN:  Good afternoon, your Honor.  Janelle Austin representing the chief of police from Kopelman & Paige, Town Counsel.

THE COURT:  Good afternoon, Ms. Austin.

MS. AUSTIN:  Thank you.

THE COURT:  All right.  So let's do this.  Mr. Foley, why don't you start, and then Ms. Kobick and Ms. Austin, I'll give you each a reply round.

MR. FOLEY:  All right.  Thank you.  Thank you, your Honor.

1            Your Honor, very briefly, what our contention is that

2    the statute and the Commonwealth of Massachusetts that

3    permanently denies somebody the right to bear arms based on a

4    conviction of a -- any weapons violation violates the

02:49:59PM 5    Constitution under the Fourth Amend -- under the Second

6    Amendment in *Heller* and *McDonald*.

7            Your Honor, Mr. Morin, who was convicted in

8    Washington, D.C., of attempted possession of a pistol and

9    possession of ammunition without a license.  He was

02:50:17PM 10   arrested -- he was held for the weekend, and he was released

11   and ultimately paid a fine.

12           Under the Commonwealth's laws he is forever barred

13   from getting a license to carry firearms.  He cannot exercise

14   his Second Amendment rights based on this -- based on this

02:50:32PM 15   crime.

16           One of the exhibits that the Commonwealth submitted

17   was a portion of a gun control study reports a congressional

18   request that describes the interoperability of the firearms

19   licensing schemes between and among the states.  This was

02:50:52PM 20   published in July of 2012.  Mr. Morin did not have the benefit

21   of a congressional study to let him know that his license to

22   carry firearms in Massachusetts was not valid in

23   Washington, D.C.

24           The government's contention is that he's not a --

02:51:09PM 25           THE COURT:  Well --

1        MR. FOLEY:  -- responsible --

2        THE COURT:  -- in addition to that he also lied on his

3   application too; right?

4        MR. FOLEY:  I don't know that it's a -- it was a lie.

02:51:18PM 5   I believe it was a misinformation.  He did not under -- he -- I

6   believe he misunderstood the application.

7        THE COURT:  Uh-huh.

8        MR. FOLEY:  I mean he had -- he had been consulting

9   with counsel.  I -- I don't think it was an intentional

02:51:32PM 10   misrepresentation, and, in fact, had it been an intentional

11   misrepresentation, he could have been denied for that.  That

12   was not the reason he was denied.  He was denied solely for the

13   reason that he -- he's disqualified based on the conviction.

14        THE COURT:  Uh-huh.

02:51:49PM 15        MR. FOLEY:  The crime that he was convicted of is a

16   strict liability crime.  He didn't know that he wasn't allowed

17   to do that.  He thought his license to carry firearms like his

18   license to drive a motor vehicle was valid throughout the

19   United States.  He knew Massachusetts' firearms laws were

02:52:09PM 20   stricter than most of the rest of the country and made an

21   assumption that his license coming from the most strict

22   country -- strict laws in the Commonwealth would allow him to

23   carry anywhere.

24        THE COURT:  Well, the opportunity to have an

02:52:28PM 25   individual appeal went by the boards though.  I mean he could

1    have taken his appeal to the chief, and that's -- isn't that

2    what the purpose of the -- the appellate process is in the

3    state is to so we can have these individualized appeals, as

4    opposed to having the -- the federal courts do this seriatim,

02:52:49PM 5    which is not the way they want us to do this.  In fact, I don't

6    think they want us to do that at all.

7              MR. FOLEY:  Your Honor, the -- my understanding of the

8    appellate process in the District Court, and I have yet to

9    succeed at one, is that the -- the standard is to show that the

02:53:06PM 10   chief's decision was arbitrary and capricious in denying -- in

11   determining the -- the applicant was unsuitable.

12             THE COURT:  Uh-huh.

13             MR. FOLEY:  This is not a suitability.  This is

14   disqualification.  The chief cannot by law grant him that

02:53:21PM 15   license because the state prohibits it.

16             Our position is that that law itself is

17   unconstitutional.  Any -- any of the -- any of the cases the

18   Commonwealth has argued are applicable are cases involving

19   domestic violence, drugs, some sort of violence, felonies, all

02:53:42PM 20   crimes which other portions of the Massachusetts statute

21   already prohibit.

22             If you're convicted of any drug offense, you cannot

23   get a license to carry.  If you're convicted of a crime of

24   violence, you cannot have a license to a carry.  If you're

02:53:56PM 25   convicted of a felony, you can't have a license to carry.  If

1      you're convicted of a misdemeanor with a sentence over two

2      years, you can't have a license to carry.

3             The only thing this statute brings to the table are

4      nonviolent misdemeanor crimes that I argue are technical

02:54:13PM  5      violations with no mens rea, no -- they're not malum

6      prohibitum.  They're -- they are -- sorry.  They're not malum

7      in se.  It's all strict liability crimes.  Carrying a dangerous

8      weapon in Massachusetts is a felony by itself.  Carrying brass

9      knuckles in Massachusetts is a felony.  That's an automatic

02:54:34PM 10      disqualifier.  You don't have to get to this section of the law

11      that we're challenging because that's already a felony.  You're

12      disqualified by something else.

13             THE COURT:  Well, but the -- the litigation that

14      has the progeny of *Heller* is hearth and home versus the others,

02:54:59PM 15      and he -- I mean this is not a hearth and home issue.  It's

16      a -- it's a carry under A.

17             MR. FOLEY:  The only way in Massachusetts to

18      get -- have a license in your home is with a license to carry.

19      The only way you can purchase a handgun in Massachusetts is if

02:55:16PM 20      you have a license to carry firearms.  You cannot do it with an

21      FID.  So the only way you can defend your hearth and home is

22      with a license to carry firearms.

23             THE COURT:  And I'm -- and I'm -- I think I know what

24      you're going to say, and I think I already know the answer, but

02:55:33PM 25      he at least did not apply for a B or an FID; right?

1              MR. FOLEY:  No, he did not.  The -- the --

2              THE COURT:  And I agree with you, he probably's going

3    to have the same problem, but we don't know.

4              MR. FOLEY:  Well, the B no longer exists in

02:55:49PM 5    Massachusetts.  They've done away with that distinction.  Now

6    all can you apply for now is a license to carry firearms.

7    There are still some class As and Class Bs that are in

8    existence, and I believe those will be phased out within the

9    next five years when they expire.  And then at that point

02:56:09PM 10   anybody getting a renewal would just get a license to carry.

11   There will no -- not -- there will not be a Class A or a

12   Class B.

13             THE COURT:  Really?  So everybody is going to have

14   a -- be able to get a conceal to carry?

02:56:19PM 15             MR. FOLEY:  Yes.

16             THE COURT:  And on large magazines too?

17             MR. FOLEY:  Yes, that's my understanding.  Now, again,

18   large magazines would have to be prior to manufacturer in 1994

19   due to the assault weapon ban.  So a -- you know, basically, it

02:56:38PM 20   would limit you to a 10-round magazine anyway.

21             And as far as an FID, an FID does not allow you to

22   purchase a handgun.  And *Heller* specifically discusses a

23   handgun in the home for self-defense.  Mr. Morin cannot

24   purchase a handgun.  There is talk of a permit to purchase, and

02:56:58PM 25   I believe the way the law used to be, I think, prior to 1998,

1    you could have an FID, and you could apply for a permit to

2    purchase, which will let you go to the store, buy a handgun,

3    bring it home, and keep it in your house for self-defense.  To

4    the best of my knowledge, that -- none of those permits have

02:57:15PM 5    been issued since the law changed in 1998.  I believe there was

6    an inquiry done to the state, and those have not been issued

7    since 1998.

8         So without a license to carry firearms, Mr. Morin

9    cannot exercise his Second Amendment right to have a firearm --

02:57:33PM 10   to have a handgun in the home for self-defense, and this is

11   based on a -- a technical violation, a law that he did not

12   understand, a law that's contained in a 90-page report that

13   says you can't carry in Washington, D.C.  In fact, I believe

14   the -- the statute he was actually convicted of was struck down

02:57:53PM 15   by *Heller* and then rewritten too, because under *Heller*, you

16   couldn't carry anywhere, I believe.  I think the law he was

17   convicted of, he couldn't carry anywhere.  I believe it was

18   rewritten -- it was renumbered, but nevertheless, he had a

19   pistol on his ankle that he carried with him all the time.  He

02:58:14PM 20   walked up and asked where to check it, and that's a -- that was

21   his -- any time he went into any secure facility that didn't

22   allow weapons, you know, he would walk up and say, "Where do I

23   check this?"  And that's exactly what happened there.  He

24   wasn't trying to sneak it in.  He -- he wanted to know how to

02:58:31PM 25   do the right thing.

1                  THE COURT:  Thank you.  Let me hear from your sisters,

2        and then I'll come back to you.

3                  Ms. Kobick, are you going to be next?

4                  MS. KOBICK:  Sure.  Thank you, your Honor.

02:58:42PM 5     Section 131(d)(ii)(D), which is the statute that's challenged

6        in this case, disqualifies criminals who have been convicted of

7        a firearms safety offense from obtaining a license to carry

8        concealed weapons.  It's a classic firearm safety measure, and

9        it's fully consistent with the Second Amendment as that has

02:59:00PM 10    been interpreted by the Supreme Court and *Heller* and by the

11       First Circuit.

12                 I think it might help us to take a step back and just

13       talk about the analytical structure that this court -- I think

14       the parties agree this court should apply in reviewing the

02:59:12PM 15    constitutional claim.

16                 So most Courts of Appeals, not the First Circuit, but

17       most Courts of Appeals have adopted this two-step test.  First,

18       does the town statute implicate --

19                 THE COURT:  Well, and I definitely want to hear this,

02:59:24PM 20    but why wouldn't I just apply the *Hightower* analysis and just

21       do it that way?

22                 MS. KOBICK:  I think your Honor could certainly do

23       that.

24                 THE COURT:  Because I don't -- I'm not sure that (A),

02:59:38PM 25    they want us mucking around where it's not a case in

1    controversy; and B, *Hightower* perhaps --

2            MS. KOBICK:  Right.  *Hightower* is --

3            THE COURT:  -- has an analysis that will give

4    everybody a nice appellate position here.

02:59:54PM 5        MS. KOBICK:  Yeah, I think *Hightower* is directly on

6    point, and *Hightower* assumed that the Second Amendment -- it

7    was implicated and then just analyzed Stacey Hightower's false

8    answer on her renewal form, and whether revoking her license to

9    carry based on that false answer was consistent with the Second

03:00:14PM 10   Amendment, and *Hightower* said, "Yes, it is."  And your Honor

11   could certainly do that in this case.  So assume that the

12   Second Amendment is implicated.  I think there is two questions

13   if this court takes that approach.

14           First is looking at the statute, does the statute

03:00:28PM 15   survive means and scrutiny?  So does the -- the government have

16   important interests that it's trying to further in enacting the

17   statute, and does the means that are selected to effect those

18   interests, is there a substantial fit between what

19   131(d)(ii)(D) does and the government interest?  So the

03:00:46PM 20   interests here are clear, it's preventing crime and promoting

21   public safety.  Dr. Morin doesn't contest that those are

22   important, and it's well established that they are.  So the

23   question here is the fit.

24           And I've cited a number of empirical studies that show

03:01:02PM 25   that there's a very tight fit between promoting public safety

1    and preventing crime on the one hand and disqualifying people

2    like Dr. Morin who has one or two misdemeanor convictions for

3    nonviolent weapons-related offenses from obtaining a concealed

4    carry permit.  And I think the most on-point study is the

03:01:23PM 5    Wintemute study that shows that people like Dr. Morin, who have

6    one misdemeanor conviction for a nonviolent weapons-related

7    offense are 6.4 times more likely to commit crime in the future

8    than people without a comparable misdemeanor conviction.

9    They're 4.4 times more likely to commit violent offenses.  I

03:01:46PM 10   think those are really stark numbers, and that shows that the

11   legislature knew what it was doing when it disqualified people

12   who have misdemeanor weapons-related convictions on their

13   record.  Those people as a -- as a category are for more likely

14   to pose a threat to public safety going forward in the future,

03:02:04PM 15   and so there's a close relationship between the government's

16   interest and public safety and the disqualification here.

17        I think that's all your Honor needs to do to uphold

18   the statute and reject the Second Amendment claim, but if you

19   were to look to the particular facts of this case, which

03:02:20PM 20   Dr. Morin contends the court should, *Hightower* requires that

21   the court reject the Second Amendment claim here, and that's

22   because on the particular facts of this case Dr. Morin did

23   exactly what Stacey *Hightower* did.

24        So Stacey *Hightower,* like Dr. Morin, answered falsely

03:02:39PM 25   on her renewal application.  She wasn't a lawyer when she

1   filled out the application.  She had a laudable record of

2   military service and police service.  Dr. Morin has a laudable

3   record of community involvement and employment, but they both

4   answered falsely on their renewal applications.  The First

03:02:57PM 5   Circuit took a look at that and said, it's -- it's essential to

6   the functioning of the firearms licensing scheme that

7   applicants provide truthful information, because otherwise the

8   licensing authority don't know if prohibited persons are

9   getting concealed carry permits.  And so the second -- the

03:03:12PM 10   First Circuit says it doesn't violate the Second Amendment as

11   applied to permanently revoke Stacey Hightower's license in the

12   same way.  If this court is going to look at the particular

13   facts of Dr. Morin's case, it doesn't violate the Second

14   Amendment to disqualify him from a license to carry, and I

03:03:33PM 15   think his case is -- his case is far less compelling than

16   Hightower's because he has the false answer, but he also

17   violated laws in D.C. for which he has a criminal conviction.

18   He admits that he drove through a number of states on the

19   Eastern Seaboard that require permits that he didn't have in

03:03:52PM 20   order to carry his gun through those states, and I think it's

21   an essential part of responsible firearms ownership to

22   understand the laws that apply when you carry your gun around.

23   So to understand can I bring a gun into a school; can I bring a

24   gun into a federal building; can I bring a gun into a place of

03:04:11PM 25   worship, and Dr. Morin didn't do that research.  That's just

1    part of responsible firearms ownership.  He didn't research

2    ahead of time, can I carry my gun through New York, and New

3    Jersey, and Connecticut, and Maryland, and then can I approach

4    a federal government building with a gun.

03:04:26PM 5         And so for all those reasons, Dr. Morin's personal

6    case is less compelling than Stacey Hightower's was, and I

7    contend that Hightower's binding precedent that requires the

8    rejection of the Second Amendment claim here.

9         THE COURT:  Do you -- do you need a license to carry

03:04:43PM 10   to have a gun in your home?

11        MS. KOBICK:  So the Supreme Judicial Court has held

12   that you can possess a gun in your home with an FID card, but I

13   think Mr. Foley is correct that you can't purchase a --

14        THE COURT:  You can't purchase?

03:04:59PM 15        MS. KOBICK:  -- a handgun without a license to carry.

16   And effectively you need to be able to purchase a handgun in

17   order to have one in your home.  So I think this court can

18   assume that, in effect, yes, you need a license to carry to

19   possess a firearm in your home.

03:05:16PM 20        THE COURT:  Thank you.

21        MS. KOBICK:  Thank you.

22        MS. AUSTIN:  Just briefly, your Honor.

23        THE COURT:  Yes.

24        MS. AUSTIN:  As you know, the Commonwealth has

03:05:24PM 25   intervened to defend the constitutionality of the statute.

1   From the chief's perspective in this, Mr. Morin is disqualified

2   under state law.  The chief's position is that that is a valid

3   licensing scheme, and that any claim against the chief under

4   Section 1983 should not lie, your Honor, because the chief had

03:05:43PM 5   no discretion whatsoever in terms of enforcement of that law.

6   State mand -- state law mandates that the charges and -- and

7   guilty plea of Mr. Morin were statutory -- statutory

8   disqualifiers under the statute.

9           There are two different ways, as the court is aware,

03:06:02PM 10   where a license to carry can be denied or revoked or suspended.

11   One is for suitability.  That is a discretionary decision, your

12   Honor.  The second is for a mandatory statutory disqualifier,

13   which is what we have here.

14           So simply put, the chief simply did what state law

03:06:18PM 15   required the chief to do.  And for that position, for that

16   reason alone, we would say that no claim should lie against the

17   chief because there is no custom or policy or practice of the

18   town under *Monell* sufficient to satisfy a civil rights claim to

19   lie against the chief.

03:06:35PM 20           There was non -- there was nondiscretionary -- no

21   discretionary decision.  It was solely dictated by -- by state

22   law.  As a --

23           THE COURT:  Well, I mean isn't this the -- I mean

24   isn't this like an ex parte Young declaratory injunctive relief

03:06:53PM 25   situation?

1          MS. AUSTIN:  Yes, your Honor, and there is case law

2     we have cited in our papers that any -- any such claim to the

3     extent it is construed as a 20 2201 claim, it's barred by the

4     more specific cause of action under 1983, and to that extent we

03:07:09PM 5     would argue that there's no custom, policy, or practice

6     relative to the town.  There was no policy of the town that

7     required the chief to deny the license.  As the court is aware,

8     it was simply the chief received the application, did the

9     mandatory background check, as he was required to do in

03:07:28PM 10    conjunction with the state police and the Firearms Records

11    Bureau, which is the state agency that -- that assists with

12    background checks.

13          In consulting the Firearms Records Bureau, and that's

14    Exhibit C to the Commonwealth's statement of facts, the state

03:07:44PM 15    has indicated that there was a disqualifier present and,

16    therefore, the chief lacked discretion, whether that that --

17    whether that license could be granted, your Honor.  This wasn't

18    a situation where Mr. Morin -- Dr. Morin was considered

19    unsuitable as a result of the charge.  It was that the state

03:08:01PM 20    wouldn't -- even if the chief had said yes, your Honor, the

21    state wouldn't ultimately issue the license.

22          And your Honor is correct just to touch briefly on the

23    previous point, there is an appeal procedure under Chapter 140,

24    Section 131, that wasn't -- that didn't occur in this case.

03:08:18PM 25    There is an appeal to state court --

1          THE COURT:  I mean -- I mean Mr. Foley's point is well

2     taken.  It wasn't going to be successful.

3          MS. AUSTIN:  Correct, your Honor, in light of the fact

4     that there is this mandatory disqualifier, so to speak, under

03:08:30PM 5     the statute.

6          There also is an appeal procedure that I'm aware that

7     several individuals have prevailed where an applicant that's

8     denied a license to carry will go to the FRB to get the

9     disqualifier taken off so to speak.  And there is a panel at

03:08:44PM 10     the FRB that will review a disqualifier, determine if it's a

11     disqualifier, and evaluate whether that disqualifier should

12     remain.

13          But ultimately, your Honor, we would submit on behalf

14     of the chief that there is no -- there was no discretion.  The

03:08:59PM 15     chief's hands were tied so to speak.  There was nothing that

16     the chief could do even if he had wanted to issue Dr. Morin a

17     license, which didn't occur in this case, because of the

18     disqualifier.  But even if he wanted to, he couldn't.  The

19     state wouldn't issue the license.  So for that -- that reason

03:09:14PM 20     alone we would argue that the 1983 claim doesn't lie against

21     the chief as a result of his compliance with the state law.

22          THE COURT:  Thank you.

23          MS. AUSTIN:  Thank you.

24          THE COURT:  Mr. Foley, I'll give you the last word

03:09:26PM 25     maybe.

1          MR. FOLEY:  Thank you.  Very briefly, because somebody

2     is six -- statistically 6.4 times more likely to commit a

3     crime, you're trying to predict the future and you're denying

4     somebody a fundamental right based on statistics.

03:09:39PM  5          THE COURT:  Well, I think that's -- I agree that

6     statistics can be a slippery slope, but it is the end's means

7     that was talked about in *Heller*.

8          MR. FOLEY:  It is, your Honor, but, you know,

9     furthermore, I don't know that any of those studies take into

03:09:58PM 10     account a strict liability crime.  They're talking about people

11     who have committed weapons violations.  A weapons violation can

12     be anything from carrying something to using a weapon.  You

13     know, you can own a weapon and be charged with that.  If you

14     forget to lock it up, you can be charged with that.  That's a

03:10:15PM 15     weapons violation because you forgot to do something.  I don't

16     know that because you forgot to do something makes you more

17     likely to commit a crime -- a violent crime in the future.  I

18     just don't see a correlation.  I don't think these studies

19     point to that correlation.  I think these studies are pointing

03:10:30PM 20     to people committing crimes, you know, typical common law

21     crimes with mens rea that will -- indicates that type of person

22     is likely to commit another crime; whereas, somebody who has

23     committed a crime that has no mens rea is -- I don't see that

24     the future predictability of violence based on not

03:10:50PM 25     understanding a 90-page document that says where you can and

1    can't, who accepts your license.

2            And as far as, you know, the chief's liability, your

3    Honor, I would argue that, you know, I was just following

4    orders does not cut it.

03:11:07PM 5        THE COURT:  Well, I know that we have this City of

6    Gardner marijuana case that -- that you were before me a couple

7    of weeks ago --

8            MR. FOLEY:  Yes.

9            THE COURT:  -- and that may be a different situation,

03:11:24PM 10   but I don't think the chief had any discretion on this one in

11   here.

12           MR. FOLEY:  On this -- on this, he doesn't.

13           THE COURT:  Well, how can he -- I don't understand why

14   he's -- besides the fact he's probably the conduit for

03:11:38PM 15   the -- for the policy, he's between a rock and a hard place;

16   right?

17           MR. FOLEY:  Yeah, he's the licensing officer.  I mean

18   that -- that -- he's the one.

19           THE COURT:  But the legislature has told him, guess

03:11:49PM 20   what, you can't issue a license here; right?  I mean, I -- I

21   understand there's -- there's a -- there's a chain that

22   resulted in your client's license getting revoked but --

23           MR. FOLEY:  I agree, but by placing him in that

24   position, the Commonwealth would -- should also expect that

03:12:08PM 25   he's going to have to accept liability.

1          THE COURT:  Well, I'm sure the chief appreciates that.

2     All right.  Thank you.

3          MR. FOLEY:  Thank you.

4          THE COURT:  Nice job, you guys.

03:12:18PM 5          Mr. -- Ms. Kobick, do you want to...

6          MS. KOBICK:  Can I make two points, your Honor?

7          THE COURT:  You may, as long as you do it quickly.

8          MS. KOBICK:  I'll be fast.  First, under intermediate

9     scrutiny, the fit between the means and the end doesn't have to

03:12:28PM 10    be perfect, and this court is required to defer the

11    legislature's predictive judgment.  So the study is true it

12    didn't say whether there were strict liability misdemeanors or

13    not, but it's an awfully close analogy to 131(d)(ii)(D).

14         And, second, I just want to emphasize that under

03:12:48PM 15    *Heller* and the First Circuit case law, the Commonwealth can

16    legislate by category, even if it disqualifies a whole category

17    of people from possessing a firearm in their home.  The court

18    has held multiple times that it's completely consistent with

19    the Second Amendment to disqualify certain misdemeanors, all

03:13:06PM 20    felons, even nonviolent felons.  And I just think the -- the

21    nature of this particular disqualification it's obvious that

22    people who have violated firearms laws in the past, there's a

23    relationship between keeping them from possessing concealed

24    weapons and public safety so -- so we have the empirical

03:13:26PM 25    evidence, but we also have just the nature of the

1   disqualification that's permissible under the Second Amendment.

2           Thank you.

3           THE COURT:  You know, since -- since the Supreme

4   Court's last term, we have been besieged with categorical

03:13:40PM 5   approaches to all kinds of problem solving, and today is -- is

6   one of them.

7           Deferring to the legislature is just my favorite thing

8   to do too.

9           MS. KOBICK:  Well, I don't think you have -- your

03:13:55PM 10   Honor has to defer to the legislature on this one.

11   It's -- it's -- it's common sense, but there's also a robust

12   body of empirical evidence.

13           THE COURT:  I understand.

14           Nice job, you guys.

03:14:05PM 15           MS. AUSTIN:  Thank you, your Honor.

16           MS. KOBICK:  Thank you.

17           (At 3:14 p.m., court was adjourned.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3            I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and accurate

5    transcription of my stenographic notes before the Honorable

6    Timothy S. Hillman, to the best of my skill, knowledge, and

7    ability.

8

9

10       /s/ Marianne Kusa-Ryll                    9/13/16

11       Marianne Kusa-Ryll, RDR, CRR              Date

12       Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25